## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATE PLUMMER (legal name KEITH PLUMMER), | |
| Plaintiff, | Civil Action No.: 3:22-cv-137 |
| v. | Verified Complaint |
| CONEMAUGH HEALTH COMPANY, LLC, DLP CONEMAUGH MEMORIAL MEDICAL CENTER, LLC, DLP CONEMAUGH PHYSICIAN PRACTICES, LLC, and TAHER ELSDAI, | Electronically Filed |
| Defendants. | |

## VERIFIED COMPLAINT

### I.    PRELIMINARY STATEMENT

1.    Plaintiff Kate Plummer (legal name Keith Plummer) ("Plaintiff") brings this civil rights action pursuant to Section 1557 of the Patient Protection and Affordable Care Act (ACA), Title III of the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act (Section 504) to remedy discrimination on the basis of sex and disability by Defendants Conemaugh Health Company, LLC, DLP Conemaugh Memorial Medical Center, LLC, DLP Conemaugh Physician Practices, LLC, and Dr. Taher Elsdai (collectively, "Defendants").

2.    Defendants denied Plaintiff, a transgender woman, necessary health care services, specifically hormone therapy, due to her gender identity, her transgender status, and her gender dysphoria. This denial constitutes unlawful discrimination based on sex and disability. Plaintiff seeks injunctive and declaratory relief to halt Defendants' discrimination on the basis of Plaintiff's sex and disability, as well as damages.

## II.   JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under section 1557(a) of the Affordable Care Act, 42 U.S.C. § 18116(a).

4.      Venue is proper in this district under 28 U.S.C. § 1391, because all or a substantial part of the events or omissions giving rise to the claims in this action occurred within this District and because Defendants reside in or operate and conduct business within this district.

5.      Declaratory relief is authorized pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202. A declaration of the law is necessary and appropriate to determine the respective rights and duties of the parties to this action.

## III.   PARTIES

6.      Plaintiff Kate Plummer ("Ms. Plummer" or "Plaintiff") is a transgender woman who is a citizen of Pennsylvania residing in Johnstown.

7.      Defendant Conemaugh Health Company, LLC, d/b/a Conemaugh Health System, is a limited liability company organized under the laws of the State of Pennsylvania with its principal place of business at 1086 Franklin Street, Johnstown, PA 15905.

8.      Conemaugh Health Company, LLC ["Conemaugh Health System"] provides its services under the umbrella designation "Conemaugh Health Systems" and its logo. Conemaugh Health System is the largest healthcare provider in west central Pennsylvania, serving over a half-million patients each year though the Conemaugh Physician Group and Medical Staff, and its network of hospitals, clinics, and other programs. Conemaugh Health System employs over 5,000 clinical and non-clinical staff, and over 450 physicians.

DocuSign Envelope ID: EF831A67-35B0-4C9D-861D-3966D9290694

9.      Defendant DLP Conemaugh Memorial Medical Center, LLC, d/b/a Conemaugh Memorial Medical Center, is a limited liability company organized under the laws of the State of Pennsylvania with its principal place of business at 1086 Franklin Street, Johnstown, PA 15905. Conemaugh Memorial Medical Center is the flagship hospital of Conemaugh Health Systems.

10.     Defendant DLP Conemaugh Physician Practices, LLC, d/b/a Conemaugh Physician Group (the "Physician Group") is a limited liability company organized under the laws of the State of Pennsylvania with its principal place of business at 1086 Franklin Street, Johnstown, PA 15905. The Physician Group is a multi-specialty practice of physicians affiliated with Conemaugh Health System. The Physician Group is physician-led and professionally managed.

11.     Conemaugh Health System, Conemaugh Memorial Medical Center, and the Physician Group (collectively, "Conemaugh" or "entity defendants") provide an integrated collection of health care services.

12.     Defendant Taher Elsdai, M.D. ("Dr. Elsdai") is a citizen of Pennsylvania. He is a medical doctor licensed by the Commonwealth of Pennsylvania and board certified in Internal Medicine and Endocrinology, Diabetes, and Metabolism by the American Board of Internal Medicine.

13.     Dr. Elsdai is a member of the Conemaugh Physician Group.

14.     Dr. Elsdai practices medicine at Conemaugh Memorial Medical Center.

15.     Dr. Elsdai is an agent of and/or is employed by one or more of the entity defendants.

16.     Defendants provide health care services or participate in health care related programs or activities, at least a part of which directly or indirectly receive federal financial assistance, including Medicaid and Medicare.

### IV.   **LEGAL FRAMEWORK**

**Section 1557 of the Patient Protection and Affordable Care Act**

17.     To ensure equal access to health care under the Affordable Care Act, Congress placed robust antidiscrimination requirements on health care providers.

18.     One such safeguard is Section 1557, the non-discrimination provision, which expressly prohibits health care providers that receive federal funds, like Defendants, from discriminating against any individual on the basis of sex for the purpose of providing health services.

19.      More specifically, Section 1557(a) provides that "[A]n individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 USC 1681 et seq.) . . . be excluded from participation in, be denied benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of this subsection."

20.     Violations of section 1557 based on sex discrimination create a private right of action and are to be analyzed using the same standards and burdens of proof as Title IX.

21.     Section 1557's sex discrimination prohibition extends to claims of discrimination based on gender identity and transgender status.

22.     In <u>Bostock v Clayton County, Georgia</u>, the Supreme Court held that under Title VII, discrimination based on transgender status "necessarily entails discrimination based on sex." <u>Bostock v. Clayton Cty., Georgia</u>, 140 S. Ct. 1731, 1747 (2020). The Court based its decision on a "straightforward application" of the statutory text, which prohibits employers from discriminating "because of . . . sex." <u>Id</u>. at 1743; 42 U.S.C. § 2000e–2(a)(1). As the Court stated, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." <u>Bostock</u>, 140 S. Ct. at 1741.

23.     Federal courts across the country and within the Third Circuit have determined that the Supreme Court's reasoning in <u>Bostock</u> applies equally to Title IX claims of sex discrimination based on transgender status, gender identity, or sexual orientation. *See* <u>Doe v. Univ. of Scranton</u>, No. 3:19-CV-01486, 2020 WL 5993766, at *5 n.61. (M.D. Pa. Oct. 9, 2020) (collecting cases showing that "courts from sister circuits have extended the Supreme Court's reasoning in <u>Bostock</u> to discrimination claims based on sexual orientation brought under Title IX"); *cf*. <u>Evancho v. Pine-Richland Sch. Dist.</u>, 237 F. Supp. 3d 267, 297 (W.D. Pa. 2017) (determining prior to <u>Bostock</u>, that "[p]laintiffs have demonstrated a reasonable likelihood of showing that Title IX's prohibition of sex discrimination includes discrimination as to transgender individuals based on their transgender status and gender identity.")

24.     Even before Bostock, courts had routinely found that discrimination based on gender identity and transgender status violates Section 1557. *See, e.g.,* <u>Tovar v. Essentia Health</u>, 342 F. Supp. 3d 947, 953 (D. Minn. 2018) ("numerous courts that have had the occasion to

consider the precise question at issue here have held that Section 1557's nondiscrimination requirements encompass gender-identity discrimination.").

25.     The Office of Civil Rights of the Department of Health and Human Services, the agency designated by Congress to implement the ACA, has confirmed that because sex, as it is used in this context, includes gender identity, transgender individuals are entitled to protection against discrimination in access to health care. *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27984 (May 10, 2021), available at https://www.govinfo.gov/content/pkg/FR-2021-05-25/pdf/2021-10477.pdf

### Section III of the Americans with Disabilities Act

26.     The Americans with Disabilities Act (ADA) was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" with "clear, strong, consistent, enforceable standards . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. §12101(b).

27.     As the Third Circuit has held, "[t]he ADA is a remedial statute, designed to eliminate discrimination against the disabled in all facets of society," and as such, "it must be broadly construed to effectuate its purposes." Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth., 539 F.3d 199, 208 (3d Cir. 2008).

28.     Section III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

privileges, advantages, or accommodations of any place of public accommodation . . ." 42 U.S.C. § 12182(a).

29.    To prove a violation of Title III of the ADA, "a plaintiff must prove that he or she: 1) has a disability; 2) was discriminated against on the basis of that disability; 3) was thereby denied goods or services; 4) by a place of public accommodation by the owner or operator of that facility." Sharrow v. Bailey, 910 F. Supp. 187, 191 (M.D. Pa. 1995)

30.    All places of public accommodation, including "private hospitals and professional offices of health care providers," must comply with the ADA. Woolfolk v. Duncan, 872 F. Supp. 1381, 1391 (E.D. Pa. 1995); see Bragdon v. Abbott, 524 U.S. 624, 629 (1998).

31.    Courts within the Third Circuit have held that "[t]he ADA prohibits the denial of treatment solely due to disability, as well as the unjustified screening of patients," Merch. v. Kring, 50 F. Supp. 2d 433, 434 (W.D. Pa. 1999), and that "[i]n the context of medical care, allegations that the plaintiff did not receive the same care as others because of his or her disability state a claim under the [ADA]." Sharrow, 910 F. Supp. at 191.

**Section 504 of the Rehabilitation Act**

32.    The Rehabilitation Act "was the first broad federal statute aimed at eradicating discrimination against individuals with disabilities." Helen L. v. DiDario, 46 F.3d 325, 330 (3d Cir. 1995), as amended (Feb. 2, 1995).

33.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

34.     To prove a violation of Section 504, "a plaintiff must show: (1) that he [has a disability] under the Act; (2) that he is otherwise qualified; (3) that the relevant program received federal financial assistance; and (4) that the defendants' refusal to [provide medical services] impermissibly discriminated against him on the basis of his [disability]." <u>Sharrow</u>, 910 F. Supp. at 193.

35.     Section 504 has been applied to hospitals and medical providers that receive federal funding, including Medicare and Medicaid, in order "to ensure that individuals are not denied treatment or discriminated against by federally-supported entities because of a disability." <u>Id</u>.

## V.     <u>FACTUAL ALLEGATIONS</u>

36.     Gender identity is a deeply rooted, internal psychological identification as male, female, or non-binary.

37.     Although Ms. Plummer was assigned the sex of male at birth, she has a strong, consistent, and deeply rooted female gender identity.

38.     Ms. Plummer has gender dysphoria, formerly known as Gender Identity Disorder.

39.     Gender dysphoria is a recognized, serious medical condition identified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V").

40.     The DSM-V's diagnostic criteria for gender dysphoria are evidence of a marked difference between the individual's expressed/experienced gender and the gender others would assign them, which must continue for at least six months. This condition causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

This diagnosis "requires attendant disabling physical symptoms." <u>Doe v. Pennsylvania Dep't of Corr.</u>, 2021 WL 1583556, at *10 (W.D. Pa. Feb. 19, 2021).

41.     When gender dysphoria is severe, it can result in a person's inability to function in everyday life.

42.     Gender dysphoria is highly treatable. When an individual with gender dysphoria receives appropriate treatment, that individual can be fully cured of all symptoms.

43.     When not properly treated, gender dysphoria is often associated with dangerous related conditions, such as depression, debilitating distress, impairment of function, suicidal ideation, and suicide.

44.     The World Professional Association for Transgender Health ("WPATH") is the leading professional association for surgeons, doctors, medical researchers, and others who specialize in the medical treatment of people with gender dysphoria. Based on decades of clinical experience and research, WPATH has promulgated medical standards of care for treating patients with gender dysphoria ("WPATH Standards of Care").

45.     The WPATH Standards of Care were first developed in 1979. The current version of the WPATH Standards of Care, Version 7, was published in 2011 following a five-year process in which eighteen gender dysphoria specialists submitted peer-reviewed papers to help identify the most effective treatments for gender dysphoria.[1]

46.     WPATH's Standards of Care are the prevailing standards of care to be used by mental health providers and medical professionals when treating gender dysphoria. The WPATH Standards of Care are recognized as representing the prevailing guidelines for the treatment of

---

[1] The World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Appendix E: Development Process for the Standards of Care, Version 7 (7th Version 2011), available at
https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf

patients with gender dysphoria by the American Medical Association, the American Psychiatric

Association, the American Psychological Association, the American Medical Student

Association, the American College of Obstetricians and Gynecologists, the American Family

Practice Association, the Endocrine Society, the National Association of Social Workers, the

American Academy of Plastic Surgeons, the American College of Surgeons, and the World

Health Organization.

47.    The WPATH Standards of Care recognize that treatment is medically necessary

for most people with gender dysphoria.

48.    The WPATH Standards of Care provide for an individualized assessment of

medically necessary treatment for gender dysphoria, which may include the administration of

hormone therapy; psychotherapy for purposes such as exploring gender identity, role, and

expression; and gender affirming surgery, including sex reassignment surgery.

49.    The WPATH Standards of Care make it clear that hormone therapy is a medically

necessary intervention for many individuals with gender dysphoria.

50.    The Endocrine Society is the leading professional organization devoted to

research on hormones and the clinical practice of endocrinology. The Endocrine Society has

issued a "Position Statement" and Clinical Practice Guideline for transgender health and the

treatment of gender dysphoria.[2]

51.    The Endocrine Society recognizes that treatment for gender dysphoria is

medically necessary and that, when appropriately monitored, medical interventions for patients

---

[2] *Transgender Health: An Endocrine Society Position Statement*, Endocrine Society (Dec. 2020) available at https://www.endocrine.org/advocacy/position-statements/transgender-health#6; *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons:* Hembree WC, Cohen-Kettenis PT, Gooren L, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 The Journal of Clinical Endocrinology & Metabolism 3869 (Nov. 2017) available at https://academic.oup.com/jcem/article/102/11/3869/4157558.

with gender dysphoria, including hormone therapy, are effective, safe, and part of the established

standard of care. The Endocrine Society's Clinical Practice Guideline for treating individuals

with gender dysphoria contains a standard plan for monitoring transgender females on gender

affirming hormone therapy.[3]

52.     Ms. Plummer can recall having identified strongly as female since she was 5 years

old.

53.     Ms. Plummer was diagnosed with gender dysphoria in 2017.

54.     When untreated, Ms. Plummer's gender dysphoria affects several major life

activities, including, but not limited to, her ability to sleep, think, and work, and her ability and

desire to interact with others, including sharing intimacy.

55.     Shortly after receiving this diagnosis in 2017, Ms. Plummer began receiving

hormone therapy to treat her gender dysphoria.

56.     Ms. Plummer moved to Johnstown in or around April 2020.

57.     In or around August 2020, Ms. Plummer made an appointment with Dr. Emily

Satkovich, an internal medicine specialist at Conemaugh Health Systems. Ms. Plummer made

this appointment with the goal of continuing her hormone therapy under the supervision of a

local doctor.

58.     On August 20, 2020, before the appointment with Dr. Satkovich, Ms. Plummer

wrote a message to Dr. Satkovich via Conemaugh's internal messaging system. In this message,

Ms. Plummer explained that she is transgender, that she had been diagnosed with gender

dysphoria in 2017, and that she wished to resume treatment with a provider in Johnstown.

---

[3] *Id.*

59.     On August 20, 2020, Ms. Plummer shared her medical records, including records related to her gender dysphoria and hormone therapy, with Dr. Satkovich.

60.     Ms. Plummer met with Dr. Satkovich on August 24, 2020. At this appointment Ms. Plummer explained that she is transgender, that she had previously been diagnosed with and prescribed hormone therapy to treat gender dysphoria, and that she wished to continue receiving hormone therapy to treat the symptoms of her gender dysphoria and to continue to progress in her gender transition.

61.     Dr. Satkovich referred Ms. Plummer to Conemaugh's endocrinology department, so that Ms. Plummer could consult with an endocrinologist and continue hormone therapy.

62.     Dr. Satkovich told Ms. Plummer that the endocrinology department would reach out to her within a week to set up an appointment.

63.     An appointment with endocrinology was never scheduled.

64.     According to Ms. Plummer's medical records, Dr. Satkovich's referral for a consultation with endocrinology was denied.

65.     Based on information from Conemaugh's administrative staff, it was Dr. Taher Elsdai or someone in Dr. Elsdai's office who denied the referral.

66.     It is not normal practice for a doctor to "deny" a referral for a consultation, especially without providing a reason for this denial and/or without providing a referral to another provider.

67.     No one from Conemaugh reached out to Ms. Plummer to inform her that the consultation had been denied, to explain the reason for this denial, or to provide a referral to another provider.

68.     In November 2020, Ms. Plummer reached out to Conemaugh to inquire about the delay in scheduling an appointment with the endocrinology department.

69.     A Conemaugh administrator scheduled a virtual appointment for Ms. Plummer for December 1, 2020.

70.     Ms. Plummer believed the appointment on December 1, 2020, would be with someone from the endocrinology department.

71.     On December 1, 2020, at the virtual appointment, Ms. Plummer learned that the appointment was with Dr. Satkovich, not with someone from the endocrinology department.

72.     Dr. Satkovich's colleague and supervisor, Dr. Waseem, also participated in the appointment on December 1, 2020.

73.     Dr. Satkovich informed Ms. Plummer that following the appointment on August 24, 2020, Dr. Satkovich had attempted to get Ms. Plummer an appointment with endocrinology on multiple occasions, but that this referral repeatedly failed to go through.

74.     While Dr. Satkovich indicated an interest in prescribing Ms. Plummer the hormones she had received through her previous physician, Dr. Waseem told Ms. Plummer that she does not prescribe hormones as part of her practice and that Ms. Plummer would need to see an endocrinologist to receive a prescription for hormone therapy.

75.     On or around December 1, 2020, Dr. Satkovich and Dr. Waseem put in another referral to the endocrinology department at Conemaugh Memorial Medical Center.

76.     On December 15, 2020, Ms. Plummer received a phone call from a Conemaugh administrator.

77.     The Conemaugh administrator confirmed that Ms. Plummer had been attempting to schedule an appointment with endocrinology to restart her hormone therapy.

78.     The administrator informed Ms. Plummer that Conemaugh's endocrinologists "do not do that sort of thing."

79.     It is Ms. Plummer's understanding that the endocrinologist the administrator was referring to was Dr. Taher Elsdai.

80.     The administrator advised Ms. Plummer to search for a doctor in Pittsburgh instead of continuing to seek hormone therapy from Conemaugh.

81.     On December 28, 2020, Ms. Plummer reached out to Conemaugh's Ethics and Compliance Office to complain about these denials and to formally report these actions as discrimination.

82.     Ms. Plummer spoke with Liz Nicodemus, a Compliance, Privacy, and Ethics Officer at Conemaugh, who informed Ms. Plummer that she would begin an investigation into this matter.

83.     On December 31, 2021, Ms. Nicodemus sent Ms. Plummer an email stating that "we cannot meet this treatment need for you," referring to Ms. Plummer's need for hormone therapy.

84.     Ms. Plummer followed up with repeated requests for a more detailed explanation regarding the delay and denial of care or a consultation.

85.     On January 7, 2021, Ms. Nicodemus sent Ms. Plummer an email which included a statement that Conemaugh does "not discriminate, exclude or treat transgender people differently." This was Conemaugh's only response to Ms. Plummer's request for an explanation. Conemaugh did not provide any further explanation or reasoning for denying Ms. Plummer a consultation with endocrinology or for denying her hormone therapy treatment.

86.     Neither Ms. Nicodemus nor anyone from Conemaugh ever provided Ms.

Plummer with an investigation report related to her complaint, despite Ms. Plummer's request

for this information.

87.     Throughout December 2020, Ms. Plummer continued to seek assistance from Dr.

Satkovich and Dr. Waseem's office.

88.     On December 30, 2020, Dr. Waseem left Ms. Plummer a voicemail stating that

she had reached out to the endocrinology department about getting Ms. Plummer "transgender

and hormonal therapy." In this voicemail, Dr. Waseem relayed that the doctors in the

endocrinology department "don't provide this service." It is Ms. Plummer's understanding that

the endocrinologist Dr. Waseem was referring to was Dr. Elsdai.

89.     In the December 30th voicemail, Dr. Waseem recommended that Ms. Plummer

seek medical care from Planned Parenthood in Greensburg or Pittsburgh. Dr. Waseem did not

provide any additional information about these providers or make a referral to a specific

physician.

90.     On January 1, 2021, Ms. Plummer received an email from Dr. Satkovich, in

which Dr. Satkovich repeatedly apologized for how Ms. Plummer's care had been handled.

91.     On January 6, 2021, Ms. Plummer received an email from Dr. Waseem stating,

"we are working to see why there was so much delay in getting a response from Endocrinology."

92.     On January 22, 2021, Dr. Waseem followed up with an email stating,

"Endocrinology has declined the referral – they don't manage the diagnosis and recommend

referral to Pittsburgh." It is Ms. Plummer's understanding that the endocrinologist Dr. Waseem

was referring to was Dr. Elsdai.

DocuSign Envelope ID: EF031A67-25B9-4C9D-861B-3866D9290694

93.    As an endocrinologist, Dr. Elsdai specializes in the provision and management of hormone therapy.

94.    It is common practice for Primary Care Physicians and other providers to refer patients to endocrinologists, like Dr. Elsdai, when those patients require hormone therapy.

95.    Dr. Elsdai could have conducted a consultation with Ms. Plummer.

96.    Instead, Dr. Elsdai denied the referrals made by Dr. Satkovich and Dr. Waseem on multiple occasions.

97.    Dr. Elsdai refused to meet with Ms. Plummer for a consultation and did not refer her to another provider.

98.    It is atypical for a specialist to reject a consultation without providing a reason or offering a referral.

99.    Months after her referral was denied, and only after Dr. Waseem and Dr. Satkovich made multiple inquiries, was Ms. Plummer told that the Conemaugh endocrinologists "don't manage the diagnosis."

100.    As an endocrinologist, Dr. Elsdai should be aware of or should have been able to access the standards for treating gender dysphoria.

101.    According to the Endocrine Society and WPATH, lack of knowledge regarding treatment for gender dysphoria is not an excuse to deny patients necessary medical care; rather, hormone providers have a responsibility to acquire knowledge and experience in treating gender dysphoria by, *inter alia*, working with experienced providers, taking a gradual approach to treatment, remaining up to date with the medical literature, and discussing issues with colleagues.

102.    Dr. Elsdai and Conemaugh's Endocrinology Department had ample opportunity to accept the referrals made by Drs. Satkovich and Waseem and to meet with Ms. Plummer.  If necessary, they could have consulted the medical literature and standards on treating gender dysphoria or consulted with other medical professionals, including the doctors who had previously managed Ms. Plummer's hormone therapy. Upon information and belief, Dr. Elsdai and Conemaugh did not engage in any of these actions before denying Ms. Plummer's referral for a consultation.  Rather Defendants denied Ms. Plummer's consultation based on Ms. Plummer's transgender status and her diagnosis of gender dysphoria.

103.    The hormones Ms. Plummer was seeking and had previously been prescribed to treat her gender dysphoria are commonly prescribed medications. These medications are used for a variety of purposes other than to treat gender dysphoria, including, *inter alia*, to treat menopause, heart failure, fluid retention, high blood pressure, hair loss, and prostate enlargement.

104.    Endocrinologists, like Dr. Elsdai, regularly prescribe these medications.

105.    Upon information and belief, Dr. Elsdai and other doctors at Conemaugh have previously prescribed cisgender[4] patients the medications Ms. Plummer was seeking.

106.    On or before, December 28, 2022, Conemaugh was made aware of the fact that Ms. Plummer had been denied a consultation with endocrinology and denied hormone therapy treatment, when Ms. Plummer raised allegations of discrimination with a member of Conemaugh's Ethics and Compliance Office.

---

[4] Cisgender is a term used to describe a person whose gender identity conforms with the sex he or she was assigned at birth – *i.e.*, someone who is not transgender.  *PFLAG National Glossary of Terms*, PFLAG, June 2022, available at https://pflag.org/glossary.

107. Upon information and belief, Conemaugh did not take any steps to prevent or correct this denial of care, nor did Conemaugh institute any corrective actions, despite their ability to do so.

108. Because Defendants refused to conduct a medical consultation for Ms. Plummer and to provide her with hormone therapy to treat her gender dysphoria, Ms. Plummer was denied necessary medical services for seven months.

109. The prospect of continuing not to receive hormone therapy posed a significant risk to Ms. Plummer's health.

110. As a result of Defendants' continued discrimination, Ms. Plummer was forced to and continues to be forced to seek medical care from a provider located several hours from her home.

111. More troubling, Defendants' discriminatory conduct caused Ms. Plummer severe anxiety, embarrassment, and physical and emotional distress.

112. During the seven months Defendants were denying Ms. Plummer access to medically necessary treatment, she had repeated panic attacks, which involved increased heart rate, irregular breathing, and nausea.

113. She experienced depression and dissociative episodes, which strongly impacted her ability to function and feel joy in her day-to-day life.

114. During this time, the distress she experienced caused headaches and trouble sleeping.

115. Ms. Plummer refrained from socializing, and experienced feelings of anger, desperation, and powerlessness, because she felt that her medical providers were not listening to

her and because she feared that she would not be able to access the hormone therapy or other treatment necessary to reconcile her gender identity with her assigned sex.

116.    Ms. Plummer experienced fear that the progress she had made in her transition would regress as a result of this seven-month disruption in treatment and that this disruption would permanently compromise her ability to live as a woman in the future.

117.    In order to manage her mental health symptoms, Ms. Plummer sought mental health treatment, where she was prescribed anti-anxiety medication. Ms. Plummer attributes her need for this medication to Defendants' actions/omissions and to the anxiety and distress this discrimination caused her.

118.    For seven months, Conemaugh failed to provide Ms. Plummer with medically necessary services, failed to provide her with information and answers regarding her treatment, and ultimately forced her to seek medical assistance from a provider located several hours from her home. As a direct, proximate, and foreseeable result of Defendants' discriminatory practices, as described above, Ms. Plummer has suffered, and continues to suffer loss and injury, including, but not limited to, physical and mental injury, humiliation, emotional distress, and the deprivation of her civil rights. Ms. Plummer must also spend needless time and energy in order to receive treatment for her gender dysphoria from providers located much further from her home.

### VI.    CAUSES OF ACTION

**COUNT ONE: Violation of section 1557(a) of the Affordable Care Act**

119.    All previous paragraphs are incorporated as though fully set forth herein.

120.    Defendants meet the qualifications for being a "health program or activity, any part of which is receiving Federal financial assistance" under Section 1557(a).

121.    Defendants, by their actions and those of their agents, as described herein, violated and continue to violate Section 1557(a) of the Affordable Care Act by intentionally causing Plaintiff to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance" based on sex, which is a prohibited ground of discrimination under Title IX.

122.    Cisgender women similarly situated to Ms. Plummer would not have been denied a consultation with an endocrinologist and medically necessary hormone therapy by Defendants.

123.    Patients seeking the same or similar hormone therapy for diagnoses not related to their gender identity or to the process of changing the physical characteristics of their sex would not have been denied a consultation with an endocrinologist and hormone therapy by Defendants.

124.    Defendants have, therefore, violated Section 1557(a) by denying Ms. Plummer necessary medical care, namely a medical consultation and hormone therapy, based on her sex.

**COUNT TWO: Violation of the Americans and Disabilities Act**

125.    All previous paragraphs are incorporated as though fully set forth herein.

126.    Ms. Plummer is a qualified individual with a disability, gender dysphoria, which, substantially limits major life activities including, *inter alia,* her ability to sleep, think, and work, and her ability and desire to interact with others, including sharing intimacy.

127.    Defendants' facilities and offices are places of public accommodation. *See* Sharrow v. Bailey, 910 F. Supp. 187, 192 (M.D. Pa. 1995).

128.    Defendants discriminated against and caused Ms. Plummer to be excluded from participation in programs and denied access to medical services, because of Ms. Plummer's disability, in violation of Title III of the Americans with Disabilities Act.

129.    Specifically, Defendants denied Ms. Plummer a medical consultation and hormone therapy services regularly provided to patients with other illnesses, due to the nature of her disability. Had Ms. Plummer been seeking the same or similar treatment for a diagnosis other than gender dysphoria, Defendants would not have denied her access to a consultation and to hormone therapy. Thus, Defendants have a practice or policy for patients seeking hormone therapy for gender dysphoria, which is different and less favorable than the practice or policy they have for patients seeking hormone therapy for diagnoses other than gender dysphoria.

**COUNT THREE: Violation of the Rehabilitation Act**

130.    All previous paragraphs are incorporated as though fully set forth herein.

131.    Ms. Plummer is a qualified individual with a disability, gender dysphoria, which substantially limits the major life activities including, *inter alia,* her ability to sleep, think, and work, and her ability and desire to interact with others, including sharing intimacy.

132.    Defendants receive federal financial assistance, including Medicare and Medicaid.

133.    Defendants discriminated against and caused Ms. Plummer to be excluded from participation in programs and denied access to medical services, due to Ms. Plummer's disability in violation of Section 504 of the Rehabilitation Act.

134.    Specifically, Defendants denied Ms. Plummer a medical consultation and hormone therapy services regularly provided to other patients, due to the nature of her disability. Had Ms. Plummer been seeking the same or similar treatment for a diagnosis other than gender

dysphoria, Defendants would not have denied her access to a consultation and to hormone therapy.

## VII.   <u>PRAYER FOR RELIEF</u>

135.   WHEREFORE, Plaintiff respectfully requests the court to enter an Order:

(a) Declaring that Defendants' conduct in denying hormone therapy and denying even a consultation to Plaintiff Kate Plummer because of her sex and transgender status violates non-discrimination provisions of the Affordable Care Act;

(b) Declaring that Defendants' conduct in denying hormone therapy and denying even a consultation to Plaintiff Kate Plummer because of her gender dysphoria violates Section III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

(c) Permanently enjoining Defendants from engaging in the conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(d) Awarding compensatory damages to Plaintiff in an amount to be determined that would fully compensate Plaintiff for the injuries caused by the conduct of Defendants alleged herein;

(e) Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b); and

DocuSign Envelope ID: EF031A67-25B9-4C9D-861D-3866D9290694

(f)  Awarding other equitable and further relief as the court deems just and proper.

Respectfully Submitted,                     Date August 24, 2022

*/s/ Jacqueline Perlow*
Jacqueline Perlow, Esq.
Pa.I.D. #321594
jperlow@cjplaw.org

*/s/ Kevin Quisenberry*
Kevin Quisenberry, Esq.
Pa.I.D. #90499
kquisenberry@cjplaw.org

Community Justice Project
100 Fifth Avenue, Suite 900
Pittsburgh, PA 15222
T (412) 434-6002
F (412) 434-5706

# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATE PLUMMER (legal name KEITH PLUMMER), | Civil Action No.: |
| Plaintiff, | Verified Complaint |
| v. | Electronically Filed |
| CONEMAUGH HEALTH COMPANY, LLC, DLP CONEMAUGH MEMORIAL MEDICAL CENTER, LLC, DLP CONEMAUGH PHYSICIAN PRACTICES, LLC, and TAHER ELSDAI, | |
| Defendants. | |

## **VERIFICATION**

To my knowledge and belief, I verify under penalty of perjury that the foregoing facts set out in the Verified Complaint are true and correct.

DocuSigned by:

_Keith Plummer_
B406B46E0C1547E...
Kate (Keith) Plummer

Date: _8/24/2022_